INTER-ISLAND STEAM NAVIGATION COMPANY, LIMITED, *v.* THE BRITISH SHIP CELTIC CHIEF. MILLER SALVAGE COMPANY, LIMITED, *v.* THE BRITISH SHIP CELTIC CHIEF. MATSON NAVIGATION COMPANY *v.* THE BRITISH SHIP CELTIC CHIEF.

## June 17, 1913.

1. *Admiralty—Salvage—Improper rivalry of salvors as affecting award:* The award of a salvor may be reduced or denied by reason of an improper spirit of rivalry, prejudicial to the salvage operations and particularly to the interests of the other salving agencies.

2. *Same—Same—Basis of compensation:* Salvage compensation may be based, inter alia, on the conditions of danger from which a stranded vessel is rescued, the perishability of her cargo on exposure to sea water, the value of the property saved, the undamaged condition in which it is recovered, the time consumed in the operations, the value of the salving agencies, the number of men employed, the risk to which the men and the salving agencies are subjected, and the expenses incurred and losses suffered by the salvors.

3. *Same—Same—Right to compensation—Forfeiture:* A tug went to the assistance of a steamship stranded on a reef outside the harbor of Honolulu, and for more than 50 hours, most of the time with other vessels, pulled constantly, rendering valuable service in preventing the swell from driving the stranded ship further on the reef. At the end of that time she refused the request of the master of the ship to give her place to a larger vessel, and her hawser was cut and she was discharged from further service, but continued to stand by. *Held,* that while she was properly discharged for refusing to give up her place, she did not, because of such refusal, forfeit her right to compensation for the service rendered; and she was awarded $4,000.

4. *Same—Same—Compensation—Release of stranded steamship:* Another salvor employing four vessels in assisting the stranded ship, the lowest aggregate value of the vessels employed at any one time being $240,000, and the minimum number of men employed at any one time being 97, all being used in pulling on the ship and in lightering over 360 tons of cargo, *held* entitled to a salvage award of $17,500 and allowance for certain extra expenses; the value of the ship and cargo salved being about $135,000, of which the cargo represented about

$111,000, and the service extending over three days and nights in ordinary but threatening weather, with great danger to the ship through her pounding on the reef, and great danger to the cargo because of its perishability on exposure to sea water. And another salvor, employing five smaller vessels and a large anchor' and other equipment aggregating not over $22,000 in value and employing from 45 to 60 men at all times during three days and nights in pulling on a laid-out anchor and in lightering about 240 tons of cargo, *held* entitled to $8,000 and allowance for certain extra expenses; the awards aggregating $29,500, in addition to expense allowances aggregating $3,446.71.

5. *Same—Same—Same—Special awards to officers and crews:* In the above award to owners of salving ships, it is ordered that one-fourth be divided among officers and crews pro rata according to salaries or wages, except that in case of certain officers extra sums are first given for especially meritorious services.

6. *Same—Same—Costs—Penalizing prevailing libellants for excessive claims:* By reason of excessive claims of libellants, the court orders the taxable costs to be divided between them pro rata according to the amount of their claims.

*In Admiralty:* Libels *in rem* for salvage (consolidated for trial).

*L. J. Warren* (*Smith, Warren & Hemenway* with him) for libelants, Inter-Island Steam Navigation Company, Ltd., and Matson Navigation Company.

*P. L. Weaver* (*Magoon & Weaver* with him) for libelant, Miller Salvage Company, Ltd.

*C. H. Olson* (*Holmes, Stanley & Olson* with him) for libelee.

CLEMONS, J. Three libels *in rem*—of the Inter-Island Steam Navigation Company, Limited, claiming $35,000 as compensation for salvage services, the Miller Salvage Company, Limited, claiming $20,000 for similar services, and the Matson Navigation Company, claiming $15,000 for similar services,—against the British ship Celtic Chief, her cargo and freight, are here consolidated for the purpose of trial. During the course of the hearing, the Inter-Island

company modified its claim to $25,000 and the Matson company its claim to $10,000.

Each company libelant concedes that in addition to its own efforts in the alleged salvage operations, which effected the removal of the ship from a condition of stranding on a reef, some assistance was rendered by the other libelant companies and also "some very slight assistance" by a German cruiser the Arcona, in whose behalf no claim for compensation is made.

In behalf of the ship, the claimant, her master, Captain John Henry, contends that the Miller company, though having lightered 239 tons of cargo and rendered some service with its anchor and tackle in pulling the ship away from the reef when finally afloat, or in starting her toward deep water as she neared the floating, has forfeited any reward by reason of the wilful misconduct of its superintendent, Captain F. C. Miller, in deliberately concealing from the other pulling agents, for at least two hours before the ship left the reef, his own knowledge that she was about to float free, in order that he and his company might have the more credit for her rescue. This point was not made in the claimant's answer, but is urged in his counsel's brief from certain evidence in the case. Other misconduct of the Miller superintendent, of which complaint is made, is his attitude, appearing from the evidence, with regard to the possible bumping of the Arcona by the Celtic Chief as she came off the reef,—he desiring such collision as proof that the German cruiser was not pulling. And also the commencement of the lightering operations without laying anchors to prevent further drifting aground, and the delay in bringing to the ship's assistance an available, large anchor of the Miller company until the morning of Wednesday, two days later than agreed, are assigned as negligence.

The claimant contends that the Matson company is entitled to no salvage, by reason of the want of success of the efforts of its tug the Intrepid, and of the misconduct

of her master, Captain McAllister, in refusing to obey the request of the Celtic Chief's master to yield the Intrepid's position to the Arcona, a more powerful vessel.

As to the Inter-Island company, the claimant contends, that its services were of the lowest order of merit, mere towing and lightering under conditions of no danger to either the salvors or the salved ship, and requiring no high degree of skill, and in which the salvors were actually negligent in beginning to lighter without having laid out anchors to prevent further drifting aground. However, there is conceded to the Inter-Island company an award of $4,379.77, being interest at 40 per cent. per annum on the value of the property in use for the number of days each item was used, added to that company's own estimate of its expenses, $3,561.77, i. e., only $818 net for its services.

The claimant contends that, while the Inter-Island vessels and the Miller tackle did some pulling at the time the ship came off, one of the chief elements in her floating was the great strain on the lines of the powerful cruiser Arcona.

The value of the Celtic Chief, her cargo and freight money, is also made an issue. And with regard to costs, it is contended by the claimant that the three libelants should each bear one-third, in view of their exorbitant claims.

The facts, as found to be established by the evidence and by the admissions of the pleadings, are hereinbelow set forth.

At about 2:20 o'clock in the morning of December 6, 1909, the Celtic Chief, bound from Hamburg, Germany, to Honolulu, with a cargo mainly of fertilizer and a small quantity of general merchandise, ran aground on a shoal reef about one-half mile to the westward of the channel entrance to the Honolulu harbor. When off port early on the previous evening her master, Captain Henry, who was without experiential knowledge of Hawaiian waters, had

been warned by Captain J. R. Macaulay, the harbor pilot, of being too close to the reef, but this advice was not heeded, whereupon the pilot immediately boarded the ship and offered further advice, which, also, was not heeded until too late. And at 9 o'clock that night the ship ran lightly aground on this reef, where she remained in a calm until 2 o'clock the next morning, when an off-shore breeze arising, she put on sail and endeavored to make the open sea, but had hardly gained headway before the breeze died down and left her in nearly the same position as before.

The reef in this locality runs east and west in ledges of coral rock, the outer ledge rising abruptly from deep water and extending back in a northerly direction on a plane of very slight grade for about a thousand feet to another ledge from two to four feet higher. The surface of the outer ledge presents patches of sand interspersed with hummocks of outcropping coral, some of them of boulder size. Though the seabottom here shows superficially more sand than coral, the dominant character of the reef is coral rock, somewhat sharp and of some degree of hardness but at its surface not hard enough to withstand grinding under the moving weight of a vessel such as the Celtic Chief.

The air continued calm until about daybreak of Monday. Thereafter a light southeasterly breeze prevailed instead of the northeast trades which blow most of the year, but the indications, indeed immediate probabilities, were of a "kona" or period of southerly winds likely to blow strong and steady for several days, not uncommonly developing into a protracted gale. See The Chiusa Maru, 3 U. S. Dist. Ct. Haw. 366-367. A considerable but by no means extraordinary swell was striking the ship on her starboard quarter, and a current of from one to three knots per hour was running more directly against her starboard,—in other words, the current ran more from east to west and the swell more from south to north, the former more parallel with the reef, the latter more at a right angle with the reef.

The southerly swell continued throughout the stranding, varying in height to an average maximum of about eight feet. One of the photographs in evidence forcibly bears out the testimony on this point. The swell broke on the reef somewhat further in than the ship, as is also shown by two of these photographs; and of course, the sudden change of elevation of the plane of seabottom on going from deep water to the reef would tend to roughen the water in the vicinity.

For some time after both the first stranding and the second stranding, signal lights of distress were burned, but without response, and it was not until after daylight that help came when at about 6:30 o'clock the Young Brothers' launch Huki-Huki appeared. She exerted a pull on the stern of the Celtic Chief with a new 4-inch Manila hawser (Manila lines are herein measured by circumference, steel lines by diameter), but withdrew after about an hour. No claim is made in her behalf. At about 7 o'clock there came the tug Intrepid of the libelant Matson company, which after a few minutes' inconclusive dickering for terms of compensation, gave the ship Celtic Chief a 12-inch Manila hawser about 100 feet long with a 1 1-8-inch steel wire about 300 feet long attached to it, making a line of about 400 feet clear length. She towed more or less continuously until Wednesday noon. The tug's position was almost astern, her line attached to the ship's starboard quarter. The intrepid's tonnage was, gross 123, net 55. Her engines were of 350 horsepower. No showing was made of the useful or effective thrust of her propeller. She carried 12 men including her master.

When the first assistance came, the ship lay headed in a northeasterly direction, making an angle of about 45 degrees with the reef, with her stern on its outer edge and her bow free, her starboard anchor down.

As the current and swell inclined to move the ship further on the reef and into a broadside position, and as her

starboard anchor had comparatively little holding power from the small amount of chain which was out, and which could be put out with safety as she lay, it was decided by the master and by Captain Macaulay, who remained on board throughout and was the master's chief counsellor during the stranding, to be of great advantage to get the ship at right angles to the reef so as to receive the sea as much as possible right astern. Accordingly, the starboard anchor was taken up and, with the tug and the launch holding her stern, the ship swung around to the desired position, her head pointing northerly. This position was maintained until she came off at 12:20 o'clock a. m., of Thursday.

From the moment of touching the reef, and until the arrival of the tug Intrepid, the ship was gradually altering her position, being carried forward by the swell, her tendency being toward a position broadside to the reef. After taking the tug's line, her position on the reef was easier, but in spite of the efforts of the tug and of the Inter-Island vessels which soon arrived, she kept gradually going in during Monday until on that night she was aground for her whole length, and moved about six feet still further in on Tuesday; by Wednesday morning her forward movement had ceased. In this forward movement she had been carried fully 70 feet. Her final position, solid on the reef, may be appreciated by a comparison of her draft laden to water-line, as she was on this voyage,—20 feet 10 inches forward and 21 feet aft,—with the soundings of the water around her,—16 feet forward, 18 feet amidships, and 19 feet aft.

The Inter-Island company's steamship Mikahala arrived at about 10:30 o'clock on Monday morning, and within a half hour later the Mauna Kea of the same company. The master of the Celtic Chief, upon their inquiry, expressed his desire to have all the assistance obtainable, and they at once passed lines to the ship,—the Mauna Kea a new

12-inch Manila hawser of about 600 feet length through the ship's port quarter wharfing chock and fast around the mizzenmast, and the Mikahala a new 8-inch Manila hawser through the ship's starboard quarter chock to strong iron bitts on the main-deck. The Mikahala's line was attached to a bridle (or double line) running in through the steamer's midship chocks, port and starboard. On Wednesday the Mikahala ran a second line of the same kind and size from her port chock amidship to the same point of attachment on the Celtic Chief as her first line. The Mikahala pulled by use of her propellers almost continuously thereafter until the ship was floated, having out about 400 feet of towing line and her port anchor down about two points (a point is 11½ degrees) east of the ship's stern, with about thirty fathoms of chain in about five fathoms of water,— the purpose of her anchor being principally to maintain her in position. Her bearing from the ship was S. E. by S. The Mikahala's tonnage was, gross 444, net 354. Her engines were of 404 horsepower. The useful or effective thrust of her propeller was about 2.97 tons both tied up and running free. She carried a crew of 35 men besides her master.

The Mauna Kea dropped anchor off her port quarter, put a heavy and steady strain on her line and, after several hours' pulling, parted it at the ship's quarter chock. The line was again made fast, and the steamer, going full speed ahead in a quick jump, broke it a second time, pulling so hard as to make a 1 3/4-inch dent in the steel mast to which the line was fast. Once more she ran her line to the ship and pulled until 7 o'clock Tuesday morning when she left to make her regular scheduled run to Hilo with mail, passengers and freight, and her place and towing line were taken at 8 o'clock by the Inter-Island vessel Helene. The bearing of the Mauna Kea was southward and a little to the westward of the stranded ship. That "there was a big weight on the Mauna Kea's line all the time," "that it

had a good strain on it," is admitted by the Celtic Chief's master and first mate. The Mauna Kea's tonnage was, gross 1,566, net 940. Her engines were of 2,400 horsepower. The useful or effective thrust of her propellers was over 12 tons both tied up and running free. Her crew was of 60 men, besides her master.

The Helene placed her two 2,000-pound anchors for the special purpose of effective heaving on her anchor chains, in addition to pulling by her propellers. She lay at a distance of 635 feet from the Celtic Chief, and her starboard anchor had out 90 fathoms of chain and her port anchor about 60 fathoms, these anchors being two or three points apart. Her 12-inch line was not only itself fast to the vessel, but was also attached thereto by a bridle. The Helene's tonnage was, gross 618, net 392. Her engines were of 470 horsepower. The useful or effective thrust of her propeller was 3.11 tons tied up and 3.26 tons running free. Her crew was of 31 men besides her master.

On Wednesday noon the Inter-Island company's steamer Likelike laid out her anchor ahead about two points off the ship's stern and passed to the ship an 8-inch Manila hawser which was made fast through the port quarter hawse-pipe to bitts on the main deck. The Likelike's tonnage was gross 374, net 214. Her engines were of 340 horsepower. The useful or effective thrust of her propellers was about 2.5 tons both tied up and running free. Her crew was of 28 men besides her master.

Meantime on Monday morning at about 7:30 or 8 o'clock, Captain Miller representing the libelant Miller Salvage Company, offered his assistance, without agreement as to compensation, and about 10 o'clock the Miller boats,— the schooner Concord, the gasoline motorboat Mokolii, and the steamship James Makee,—arrived and the lightering of the cargo began, stevedores passing out by hand bags of fertilizer directly into these vessels which were moored alongside the ship. After noon of Monday the Miller

lighter Kaimiloa was also brought out. The Miller company's men continued lightering until 2:30 a. m. of Tuesday. By this time they had taken out 239 tons of fertilizer, which was carried to the wharf and discharged.

On Tuesday afternoon Captain Miller came out with a so-called 7-ton anchor (actual weight 10,000 pounds) which was finally laid out astern and connected with the Celtic Chief through the starboard after chock by powerful lines and a system of triple purchase tackles rigged on the deck of the ship and worked most of the time from the ship's duplex capstan with sixteen men at the bars, and when infrequent occasion offered by the ship's winch. These lines consisted of a new 2 1/4-inch steel wire cable attached to the anchor and a new 12-inch Manila hawser shackled to this wire at about 30 feet from the ship's stern, the Manila line being reinforced by a double piece of 1 1/8-inch steel wire. The large Manila line was attached to the system of three tackles through the first, second and third triple blocks of which ran, respectively, 7-inch, 5-inch and 3 1/4-inch falls of new Manila rope. The Miller anchor lay about 900 or more feet almost directly astern of the Celtic Chief, and a little to the starboard. The Miller company employed under Captain Miller about 45 to 60 men, most of them working overtime from 5 to 11 hours in addition to a full day on Tuesday and Wednesday, and in addition to a three-quarter day on Monday. Besides the above vessels, a small gasoline launch, the Elizabeth, was used in the Miller company's operations.

At the request of the ship's master, the Inter-Island company's superintendent Captain Haglund began lightering operations at about 11 o'clock Tuesday morning, working at the main hatch until noon, and after 1 o'clock at both the main hatch and the after hatch with an increase of men, continuing all that afternoon and evening and until about 2 o'clock Wednesday morning. Men from the crews of the Mikahala and Helene and extra stevedores, about 100

in all, were thus employed. About 6 a. m. lightering was resumed and continued until about 11:30 p. m., or shortly before the ship was free. At about noon of Wednesday a floating donkey hoist was moored by an anchor and lay opposite the main hatch off the port side, as a complement to the ship's winch which was used throughout but which was inadequate for all the work required. The Inter-Island company took out about 365 tons of cargo, carrying it in surf boats to the Inter-Island steamers, whence it was discharged at the wharf.

At noon of Wednesday the cruiser Arcona, of tonnage 2,800 and horsepower 8,200, with a full equipment of anchors and lines, came out to assist the ship, at the request of her agent and of the British consul. Monday evening and again on Tuesday she had been called upon for aid, but her commander "did not relish the job," and wanted to wait a day to see if the salving agencies at work were not successful unaided. The master of the Celtic Chief desiring that the Arcona, because of her great power, should have the most favorable position, occupied by the Intrepid, requested the master of the tug to cease towing, so that his line could be cast off, but he refused to yield. The ship's master then sent a note in writing to the same effect, stating as his reason for this action the desire "to make a good berth for the man-of-war," also offering to take the tug's line "from some other part of the ship." But as the tug still stood firm, her line was cut by order of the ship's master. The Intrepid then made room for the Arcona, and continued to lay within hailing distance in case of need, though informed that her assistance would not be required further. It was a condition imposed by the commander of the Arcona that his vessel should have the Intrepid's position astern before giving any aid.

The Arcona dropped her port anchor dead astern of the Celtic Chief and a little outside the position of the Helene. After having parted her first line, of Manila, which appears

to have been merely a messenger for another line, she passed a small wire line of her own to the ship and started ahead at increasing speed. The wire broke almost immediately. This was at about high tide, between 12 and 1 o'clock. She swung around to her anchor and drifted with the swell and current down rather close to the Helene. She hove anchor and moving further eastward and seaward, dropped her port anchor again, this time about directly ahead of the Mikahala's bow and some three or four hundred feet distant therefrom. Her stern was then on a line directly ahead of the Mikahala's bow. She paid out more chain and swung westward toward the Helene until she was half-way between the Helene and the Mikahala and seaward of them a little. She then ran a wire of her own and took one from the ship, started her engines ahead, and after pulling for from five minutes to a half hour, broke the ship's wire at about 3 o'clock. She then attempted for several hours to get a long wire aboard the Celtic Chief, but failed, and again ran two wires using the ship's broken wire which had been spliced and reinforced; between 6 and 7 o'clock she had finally made fast, and proceeded to "equalize" the wires and to then heave in on her anchor chain, not using her propellers at all. She kept somewhat of a strain on her anchor chain thereafter until the ship floated. About 8 o'clock she turned on her two large searchlights which afforded a favorable condition for the salvage operations during the rest of the evening.

A vast, and very much of it profitless, mass of testimony was offered on the point whether the Arcona did any pulling on the stranded ship,—that is, by means of her steam winch's hauling in on her anchor chain, for it was not contended that she made any use of her propellers until after the ship was free from the reef,—and if she exerted any efforts, whether they were effective. The barrenness of the depositions of the Arcona's officers, and the fact that these witnesses were content to refer to an official report

which was not in evidence, deprived the court of most of their knowledge on vital points. Detail and circumstance were greatly to be desired, but these depositions were too general and sketchy to be of much assistance, and raised inconsistencies which a more searching examination of the witnesses might have removed. This deficiency is not attributed to anything more than the inherent limitations and inefficiency of an examination on written interrogatories. The testimony of the Arcona's officers is apparently irreconcilable with that of other witnesses of undoubted veracity who were present at the time when, and for several hours before, the ship was freed. The master of the Celtic Chief also testifies in apparent disagreement with others who testified to there having been little or no strain on the Arcona's lines at that time. The testimony of the Celtic Chief's first mate, J. J. Lowry, as to strain upon the Arcona's lines is not to be referred to the vital period here, for from 10 to 11:30 o'clock he was resting below, and thereafter was busily engaged forward. His testimony of a great strain that crushed the "strong-backs" does not fix the time of this strain and it cannot be assumed to apply to the period in question,—when the witness was not in a position to observe. It may well, and most likely, have applied to the time of the Arcona's first efforts, when she was using her powerful engines to move her propellers.

[1] No justification appears for the imputation of falsehood to the German officers and Captain Henry who testified to there having been a strain on the Arcona's lines and to her having heaved on her anchor chain for the two or three hours before the Celtic Chief was floated, and the apparent conflict of testimony can be fairly attributed to nothing more than difference of view-point, difference of degree of intensity implied by use of such words as "tight," "taut," "strain," et cetera, referring to lines and anchor chains, and perhaps, though less likely, to actual error of observation.

The reason which at least four credible witness assign as preclusive of the application of any power to the anchor chain, to-wit, that if such power had been applied, the Arcona or her lines would have run afoul of the Mikahala, is somewhat difficult to explain away: but repeated reviews of the testimony, and regard for the principle by which testimony in apparent conflict is to be reconciled if possible,—for we are not to impute untruth to anyone in the first instance or to one witness rather than to another,— all incline me to the belief, that such testimony of Captain Macaulay and other credible witnesses is in error. I do not think the Arcona's anchor was as far over toward the line of direction of the Mikahala as Captain Piltz., e. g., believed or supposed.

And the testimony of the Inter-Island witnesses bears this out. Although Captain Macaulay placed the Arcona's anchor far over on the port bow and directly, and only a little, ahead of the Mikahala and the Mikahala's anchor out dead ahead of the Mikahala, Captain Tullett, master of the Mikahala, placed the anchor of his own ship about as far over on her port bow as he, and as Captain Macaulay also, placed the Arcona's anchor with relation to that vessel, but much further ahead of the Mikahala than Captain Macaulay. Now, again, Captain Piltz, first officer of the Mikahala, testifies not that the anchor of his ship was dropped dead ahead, as Captain Macaulay's diagram shows, but "on our weather, port, bow," and that "the winches were used, first pulling to take in slack of another chain and after[wards] keeping tight; that was the way we lay, with anchor chain ahead tight." So, if the Mikahala's anchor lay on her port side and the chain was kept taut, the result would be that the Mikahala with strain on her chain, would be pulled as far over to port as was the Arcona with strain on her chain, and there would be no danger of interference. To appreciate these conditions, reference should be made to Captain Tullett's diagram,

libellants' exhibit "H." I may say here that I am not unmindful that after 11ʰ:45 o'clock the Mikahala had lost her anchor in an effort to heave -it in, on her master's order to get in readiness to tow the Celtic Chief. But it was then still the Mikahala's duty to look out for the Arcona, and it may be presumed that she did it. Another thing, in spite of some instances of clumsiness and want of foresight and of forethought manifested in the Arcona's operations, it should not be inferred except as an unavoidable inference, that she would place her anchor in a position of danger to herself and to the Mikahala. It is equally clear that the Mikahala's officers so intelligent, alert, and experienced in salvage operations, would not have observed such action on the part of the Arcona without complaint or effort to have her take a safer position,—of which there is no evidence. The Arcona moved her anchor from its first position to avoid interference with the Helene on her starboard: is it reasonable that she should have picked up anchor only to at once place herself in danger of interference with another vessel on her port,—especially when consideration for her own safety and great reluctance at mixing in the operations at all, were her prime controlling motives?

The testimony of the Inter-Island witnesses on this point is, on the one hand, of the tautness of Manila lines and, on the other, of the slackness of steel wire lines,—or rather not so much a condition of slackness of lines as of lines running from their points of exit at more or less of an acute angle or approaching the perpendicular, as contrasted with a condition of lines standing out more or less horizontally, "tight as a fiddle string," as one witness, though not an Inter Island witness, said in exaggeration. Such testimony might be explained by differences of density of the lines compared; the Manila line tends to float, the steel wire to sink, and under even a fair strain a long steel line would

naturally not be as straight as a line of more buoyant material, such as Manila rope.

On the whole, though the depositions leave much to be desired on this point, I am of opinion that there was some strain on the Arcona's lines, perhaps such a strain as the power of her winch would permit, or could effect under the conditions,—it being remembered that the weight of the two long steel wires and the force of the current and swell against the comparatively large mass of the cruiser gave some resistance for the winch to overcome, aside from the resistance or inertia of her anchor and anchor chain. I do not find that the winch was being used constantly,—but, in accordance with the commander's orders, that "the hawsers were to be made taut by heaving in the chain," and "to be kept taut all the time by heaving in the chain as soon as the hawsers would slacken." Witness Mason described her lines fairly when he said, that the Arcona was "only hanging on to her anchor,"—"not pulling, but her lines were fairly taut."

However, as it is conceded by the claimant, that the Arcona was exerting force only through her winch's heaving in on the anchor chain, there seems to have been no occasion for all the contention and the great mass of testimony over so small an element of aid.

For the Helene was using her own winch in the same way and had down two anchors whose combined weight, with the combined weight of their chains, was at least about a ton and a third, and perhaps two and a third tons more than the weight of the Arcona's anchor and chain, and the Helene put all the power that she could on her winch. The Helene's two anchors were laid further out than the Arcona's anchor, one about 200 feet further and the other 30 feet further, giving her anchors better holding power. As the Helene was exerting power more effectively, as I find, in a similar way at the same time, it cannot be

that the Arcona can take all the credit or any more than a share of the credit for pulling the Celtic Chief from the reef. The mere fact that the Arcona was a larger vessel than the Inter-Island boats, and her engines vastly more powerful, is immaterial. Her anchor-moving agencies cannot be presumed,—in view at least of the evidence as to the comparative size of anchors of the two vessels,—to have been any more powerful. But, at all events, I do not find that it was any pulling agencies that saved the ship from her position on the reef,—that is, primarily. But it was the lightering that put her further afloat or so nearly afloat that her moving was comparatively easy.

The pulling agencies did not keep her from going further on the reef at least until some time on Tuesday,—which is rather significant and, to my mind, speaks strongly of the force of the Helene's heavy anchors then placed, at about 8 o'clock a. m., far out ahead for the express purpose of holding. The forward movement of the Celtic Chief had already ceased a day or so before the Arcona was finally made fast to the ship. So the cruiser cannot have any credit on that score.

It may be, however, that too much credit should not be given to the Helene for the ship's final stationary position, in view of the circumstantial evidence,—afforded by the soundings above given, showing a rapidly lessening depth of water from stern to stem,—of the hard-aground condition of the ship as due to her keel's being carried forward with great force against a more sharply sloping sea-bottom. It may be noted, that earlier soundings had showed 19.5 feet all around the ship; also that her keel was, finally, embedded 6 inches, in Captain Macaulay's opinion, and as much as 12 inches, in the opinion of other experienced seamen. But, this might prove only the ship's stable equilibrium at low or average water, and not that the considerable holding power of the Helene's anchors would not be called for at high tide large, when the sea

level was a foot and a half or more higher. And, under all the evidence, I feel justified in giving full credit to the Helene's anchors for the ship's secure position.

The pulling agencies had accomplished nothing positive toward the removal of the ship from her stranded position to a place of safety. Therefore it was reasonable to seek increased and more speedy lightering. In the early evening of Wednesday, a point was reached when Captains Macaulay and Henry were calculating that the removal of only a comparatively few more tons, about 80, would enable the ship to float at high tide large of that midnight. Only about 40 tons were removed, however, before lightering was stopped, at 11:30, and before that time the ship had become livelier and was soon rolling in her bed.

When the Inter-Island men stopped lightering at 11:30 o'clock Wednesday night, over 600 tons of cargo had been removed by them and the other lightering agencies. By midnight, this lightering and the increase of the tide to its flood, had, as just intimated, begun to show their effects. At about 11:45 the ship was first seen to be moving seaward, gradually, very slowly. She seemed then to stop and her subsequent movements to have been more decided and distinct, i. e., not one gradual movement. Her momentum then gradually increased again, and at 12:20 the Celtic Chief left the reef. All lines other than those of the Arcona were immediately cut away except that the Mikahala kept one line fast until she had pulled the ship off to eastward away from the Arcona which she was approaching—some say dangerously close, depending upon their viewpoint. And I am inclined to think that there was danger of bumping, though bumping did not actually occur. The Arcona kept at first both lines, and then only one, fast and towed the ship by her stern for some distance. It was understood that the Arcona was to take the ship to an anchorage, but when a mile—and unnecessarily far—

out to sea, her commander desired to be relieved. Whereupon the Mikahala towed the Celtic Chief to a safe anchorage, and in the morning the Inter-Island steamship Maui took her into the harbor.

It is undeniable that the Celtic Chief was rescued from her unfavorable position and brought to a place of safety by efforts other than her own, and that those efforts were exercised by the tug Intrepid, the Inter-Island ships and men, the Miller anchor and tackle and the Miller boats and men, and by the cruiser Arcona. The services of all but the Arcona were substantial, indispensable; the efforts of the Arcona were not substantial, were not indispensable, and were rendered in a manner which was clumsy and slow, and which might have been a source of danger. Her services would, however, be entitled to some allowance. But not as much as if she had lent her hand "with a will;" for, if it was for any purpose that she came out there, and her presence was desired there, it was for the great power of her propelling engines and not the ordinary power of a capstan engine or winch engine. It is evident that her commander preferred to wait until daylight, which had already been wasted in a prodigal manner, when by such promptness and decision as shown by the Helene, she might have been ready to exert her pulling powers at the preceding high water at noon and thereafter. This is important only as bearing on the attitude of the cruiser as a salvor, because actually her efforts were not needed: the ship would have come free without her.

It may be noted here, that a half-heartedness characterized the efforts of the Arcona's men. They were gingerly, in a fear of damage to their vessel. At the start they used comparatively small lines, then tried to put a large wire aboard but by means which were sure to fail because of the want of a buoying agency to keep the wire's great weight afloat. Their fear of the small lines is evident, wherefore the attempt to run a large line, and fearing fur-

ther breaks and the danger consequent with the smaller lines which were retained, they may not have executed quite their best efforts. The fear of fouling broken lines explains why they did not use their propeller on Wednesday night. But it seems feasible to have run the larger line, had they been persistent and only disposed to do what was necessary though inconvenient,—viz., secure a large launch (and the Arcona had one herself) or buoying agency to keep the heavier line from the sea-bottom. They used only small boats. It would seem, however, that the master of the Celtic Chief should himself have appreciated the necessity for a buoying agency,—for instance, the Intrepid was there at hand and with her small draft could get up close to the ship. It is probable that the careful and certain calculation of the ship's floating upon being relieved of a certain amount more of her cargo, made the Arcona's officers confident that the case would not be one requiring any great amount of pulling,—merely the operation of towing a floating ship.

[3] The Intrepid's services though on the whole of far less value than those of the Inter-Island and Miller companies, were of great value, were indispensable, as she arrived very promptly and gave the first efficient aid. Her master, Captain McAllister, did wrong in not giving place to the Arcona at the request of the Celtic Chief's master, especially as the Celtic Chief offered to take his line at another place. But he showed the right spirit in moving promptly out of the way immediately when his line was cut and in standing near by ready to help if required, even after dismissal by the Celtic Chief's master. Therefore I do not feel called upon to penalize the Intrepid though under other circumstances, especially a wilful disposition to hinder the operations, a reduced award would have been just.

[1a] Before determining the amounts of the awards to which the various libelants are entitled, I will dispose of

the claim that the Miller company had forfeited its rights by misconduct. The only fault I can find is, that Captain Miller had made too much out of what naturally arose from sportsmanlike rivalry between the Miller men and the Inter-Island men, and perhaps a little more than rivalry, though probably "only human," between these local men and the foreigners who came on the scene late and displaced one who had been the first to aid. If Captain Miller was guilty of anything, it was of false swearing, but I do not wish to be understood, for I do not feel so justified, as imputing deliberate falsehood to his testimony. His attitude as to bumping the Arcona is not approved. Some may excuse it as "only human," for it was clearly inspired by much the same considerations as have been intimated in our discussion of rivalry; yet it is heroic and generous qualities that are to be rewarded in case of salvage, the highest "human" qualities, and not the weaker "human" qualities. The award given to the Miller company will, therefore, not only for Captain Miller's mental attitude, but for the little he was actually doing under its impulse, be reduced by $400, being double the amount which Captain Miller himself considered would cover any possible trifling damage that might result from a bumping. The allegation of negligence in the Miller company's having begun lightering without having put out anchors comes with poor grace from the master of the Celtic Chief, who was from the very first advised by Captain Miller to put out the Celtic Chief's own extra anchor seaward or to let him get the Miller anchor which was finally put out, but who failed to act upon such advice. A mere reference to Captain Henry's own testimony will suffice to show the unfairness of this claim. The fact is, that Captain Henry was more anxious to have the Miller company lighter than to bring out its anchor. It might have done both, however, but so far as Captain Henry is concerned, that does not appear to have been urged by him. A similar claim

to reduce the award of the Inter-Island company is even more unreasonable. For the Helene had her anchors out three hours before the Inter-Island began lightering.

Enough has been said to indicate that what was effected on Wednesday night, might as well have been done at high tide, and more safely by daylight high tide, at least a day, and possibly more, earlier. . When the men and the ship's engines and appliances did work, they worked with energy and efficiency, though the pulling agents towed at reduced speed at low water, as was advisable. The Inter-Island and Miller men and the men of the Intrepid were deserving of praise for their efforts and their spirit.

[2] The element of danger was clearly present,—not the danger of rough weather, though that was actually imminent, but particularly the danger of the ship's being rapidly pounded to pieces on the coral sea-bottom, or thrown broadside on the reef, as the testimony shows to have been the case with other ships stranded in this vicinity. She bumped considerably and was violently shaken when lifted by the swells early in her stranding. These dangers were relieved more and more as the salving agencies came to her assistance. It does not take long for a vessel so heavily weighted to open her seams when lifted and dropped upon a resistant sea-bottom, the time of destruction being dependent upon the stress of wind and wave; and that the weather and see conditions were so favorable was a lucky circumstance. The cargo was practically all of a character perishable on exposure to sea water. The fact that no leak resulted in these three days on the reef, shows how effectively her early bumping was checked. It will be said here once for all, that the ship was saved without material injury. There was danger to the men who lightered cargo into surf boats,—especially the Inter-Island men. The case was a different one from that of lightering from a large vessel riding at anchor, and rising and falling with the swell, but to some of the men presented the peril of work-

ing in a small boat close to a solid body against which the sea was pounding, and under an overhanging sling carrying several hundred pounds' weight. The danger to the other men engaged was nothing more than is commonly involved in a seaman's or stevedore's work, except, of course, the increase of danger inherent in working under pressure and with engines and appliances strained to their limit of safety. The success of the lightering is demonstrated by the small amount of loss in the lightered cargo,— only $1,441.

The property saved was a ship whose value I find to have been $25,000, accepting practically, with a little liberality, the valuation of men more experienced in appraising ships than was the Inter-Island's witness whose expert knowledge clearly did not extend to values in the present market.

The Celtic Chief was built in Dunbarton in 1885; an iron ship of 266.8 feet length, 39.5 breadth and 22.3 depth. Her tonnage was, gross 1,789, net 1,709. Her condition was first class. She was rated by Lloyds as "100 A1." The conceded value of the cargo, including the freight thereon, was $111,000, which less $1,441, the damage to lightered cargo, gives a net value of $109,559. This added to the value of the ship gives the aggregate value of property salved, as $134,559.

The value of the Inter-Island vessels with their equipment, and the length of service of these vessels, according to their own witnesses, are as follows:

Mauna Kea,   $325,000, engaged about 20 hours;
Helene,       100,000, engaged about 12 hours;
Mikahala,      40,000, engaged about 62 hours;
Likelike,     100,000, engaged about 12 hours.

The expenses of the Inter-Island operations exclusive of regular salaries and wages, were $3,561.77, including overtime of men, extra stevedores, launch hire, use of barge

and donkey hoist, extra fuel, loss and depreciation of ropes, lines, and anchor chain and anchor. Overtime cost $456 and extra stevedores $1,059.

The highest value of the Inter-Island ships engaged at any one time was $465,000, the lowest $240,000.

The values of the Miller vessels engaged were, according to Captain Miller, as follows:

Concord, $3,000; Mokolii, $8,000; James Makee, $15,000; Kaimiloa, $2,000; Elizabeth, $4,000.

The value of the Miller anchor and tackle was claimed to be $12,000. The aggregate of these values is $44,000. The values were shown, by comparison with tax returns and purchase prices and other data, to be so exaggerated, that they can be safely discounted to one-half and still be very liberal.

[4] [5] In consideration of the foregoing views, I find that the services of the salving agents are reasonably worth $30,000—which is about $17\frac{1}{2}$ per cent. of the value of property salved, plus interest at 6 per cent. for the $3\frac{1}{2}$ years since the services were rendered: see The Chiusa Maru, 3 U. S. Dist. Ct. Haw. 361, 371, for it is only just and equitable that allowance be made for the great delays, most of them at least unavoidable. Deducting $500, which though small, is all that can be allowed for the services of the Arcona, which is not suing for an award, there remains $29,500, which is apportioned as follows:

To the Intrepid and her men, $4,000, to be divided 3/4 to her owners the Matson Navigation Company, and 1/4 to her master and crew, pro rata according to their salaries or wages and the number of hours of their service, there first being deducted, however, an award of $175, in place of any pro rata aforesaid, to Captain McAllister, whose award might have been somewhat more but for his attitude toward the request of the Celtic Chief's master.

[1b] To the Miller Salvage Company, Limited, and men, $8,000, to be divided 3/4 to the company and 1/4 to the men, pro rata according to their salaries or wages and the number of hours of their service, less $500 which would have been awarded to Captain Miller but for his attitude above discussed. That is to say, the 1/4 is to be reduced by $500 to $1,500. And, as above determined, the 3/4 is to be reduced by $400 on account of the matter of the bumping of the Arcona. The contention that the Miller company should have all the award and its men nothing, is not favored. It is urged that the men were mostly at least hired for this special work, and that the rule contended for applies also where men are in the regular employ of a company engaged in salving as a business. It is not shown with any clearness or conclusiveness, if at all, that the men were to waive any rights to a share in the award. This fact, and considerations set forth by Judge Benedict in *The Cetewayo,* 9 Fed. 717, 719, 720, influence my view of the contention.

To the Inter-Island Steam Navigation Company, Limited, and her men, $17,500, to be divided 3/4 to the company and 1/4 to the officers and crew, pro rata according to their salaries or wages and the number of hours of their service. The award to the men is to be first applied as follows: $500 to Captain Haglund, superintendent of the Inter-Island operations, $250 each to Captain Tullett of the Mikahala and Captain Nelson of the Helene, $150 to first officer Piltz of the Mikahala, and $75 to Captain Naopala of the Likelike, all these special awards to take the place of the pro rata shares of these officers in the general award to the men.

Captain Macaulay whose services were of special value, and who was on duty throughout and was the guiding spirit in the operations, and whose testimony has been

helpful in a full view of conditions at all times, makes no claim. But it would not be just to pass his services without special commendation.

As to the claims for expenses, the Inter-Island company's claim of $3,561.77 is allowed, except as to $1,515 for over-time and extra stevedores, which are covered by the general award; and the claim of the Miller company is allowed in the sum of $1,400, being the amount claimed in its libel (the actual proof was $65.26 more, but no amendment to conform to the proof is asked for, and while the court's equitable powers may permit the presumption of an amendment, this seems not a case for the exercise of such powers at this stage, unasked). The Miller company's claim of $726.30 for regular wages of men is disallowed as covered by the general award.

The court is indebted to Mr. Warren, of counsel for libelants, for his very thorough, well arranged and on the whole fair synopsis of the vast mass of testimony. Such briefs are most helpful, though it must not be understood that the court has not itself given. the case full and conscientious attention or that briefs of other counsel were not able and helpful.

[7] As to the costs, the court considers the claims aggregating $70,000 excessive, and orders that the libelants divide the taxable costs herein, hereafter to be taxed, between them pro rata according to the amount of their original claims set forth in the first paragraph of this opinion. See *The Manchuria,* 3 U. S. Dist. Ct. Haw. 150, 168.

---

*Affirmed,* with modification of awards in cases of Inter-Island Steam Navigation Company and Miller Salvage Company: *The Celtic Chief,* 230 Fed. 753.